Williams, Judge,
delivered the opinion:
This is a suit on behalf of the plaintiif, Royal Holland Lloyd, a corporation of Amsterdam, the Netherlands, brought against the United States. This court has jurisdiction under a special jurisdictional act of the Congress of the United States, approved March 3, 1927. By such act, it is provided that this court shall have jurisdiction “ to hear and determine such suit to judgment.”
The plaintiff sues to recover damages for the loss alleged to have been sustained by it by reason of the detention by the United States of the plaintiff’s ship the Zeelandia, in the harbor of New York from October 22, 1917, to. March 21, 1918.
During all of the time the Zeelandia is alleged to have been so unlawfully detained, the United States was at war with Germany and Austria. The Zeelandia was one of a fleet of vessels belonging to the plaintiff and operating under the registry of the Netherlands. During this time the Netherlands was a neutral power, enjoying friendly relations with the United States.
Prior to October 16, 1917, the Zeelandia had called at various ports in South America and taken on a cargo of coffee, cocoa, wool, tallow, and other commodities, some mails des-, tined to the United States and some fifty-five passengers, part of whom were United States naval officers who had booked passage from various South American ports to New York. The cargo of the Zeelandia was consigned to the Netherlands Oversea Trust Company, an organization created before the entry of the United States into the war, for the purpose of guaranteeing to the Netherlands and to the powers allied against Germany, that goods consigned to the corporation were for consumption in the Netherlands, rather than for reconsignment to Germany. The Zeelandia had on board a full supply of provisions, stores, and coal sufficient to enable her to complete her voyage to Holland, if no additional passengers were taken on, without taking on additional supplies. On October 16, 1917, she put into the port of New York.
On the morning of October 22, 1917, the plaintiff submitted the manifests and papers of the Zeelandia to the cus *731 toms officials in New York and asked for clearance, which was denied. Subsequent demands for clearance were añade and clearance was refused at all times from October 22, 1917, to March 21, 1918. On the latter date the United States formally seized, requisitioned and took over the Zeelandia, placing her in the active service of the United States. Compensation has been paid to the plaintiff for such seizure, and in this suit the claim of the plaintiff for damages for this detention of the vessel, from October 22, 1917, to March 21, 1918, only, is involved. The case must turn upon the question as to whether or not such detention was illegal. In determining this question, it will be necessary to examine the facts and circumstances under which the vessel was detained, in some detail, but it is first necessary to determine what law is applicable to the case.
The plaintiff grounds its claim upon the contention that the refusal to grant clearance to, and the detention of, the Zeelandia, was in violation of the statutes of the United States; second, because regardless of the statutory authority of the officials of the United States to withhold clearance, the United States is obliged to make compensation under the Constitution of the United States; and third, because the United States is liable to the plaintiff for the detention of its vessel, under the well recognized principles of international law.
In support of the proposition that the United States is liable, under its fundamental law, for the damages caused by the detention of the Zeelandia, it is urged that the detention of the vessel constituted a taking by the United States of the private property of the plaintiff, for which the Government is bound to make compensation to the owner, under the fifth amendment to the Constitution. It has been held that the guaranties of our Constitution are applicable to an alien as well as to a citizen of the United States. United States v. Wong Kim Ark, 169 U. S. 649; Truax v. Raich, 239 U. S. 33; Ex Parte Orozco, 201 Fed. 106; Wong Wing v. United States, 163 U. S. 228; that the war powers of Congress do not suspend the guaranties made in other sections of the Constitution. United States v. L. Cohen Grocery Company, 255 U. S. 81; Ex Parte Milligan, 4 Wall. 2, *732 121-127; Monongahela Navigation Co. v. United States, 148 U. S. 312; United States v. Joint Traffic Association, 171 U. S. 505; McCray v. United States, 195 U. S. 27; United States v. Cress, 243 U. S. 316; Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U. S. 146; Anson Mills v. United States, 19 C. Cls. 79. But the question presented is whether or not the refusal to grant clearance to the Zee-landia constituted a “ taking of private property, within the meaning of the fifth amendment. Of course, if the detention in question constituted a taking of private property, within the scope of the constitutional inhibition, the plaintiff is entitled to compensation. But we are of the opinion that the acts of the United States in this case did not constitute such a “ taking ” within the language of the amendment.
It has been repeatedly held that acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are not a “ taking ” within the meaning of the constitutional provision. Transportation Co. v. Chicago, 99 U. S. 635; United States v. Garver, 278 U. S. 294; Graham v. United States, 2 C. Cls. 327. In order to come within the constitutional provision, there must be shown to have been an exercise, by the United States, of a proprietary right, for a greater or less time, in the property taken. Graham v. United States, supra. Furthermore, a taking, within the meaning of the constitutional provision must have been an intentional appropriation of the property to the public use, and the appropriation must have been authorized by law. Atwater & Co. v. United States, 275 U. S. 188; Transportation Co. v. Chicago, supra; United States v. Carver, supra.
The cases cited by the plaintiff in support of its contention that the refusal to grant clearance to the Zeelandia constituted a “ taking ” of the property, Pumpelly v. Green Bay Company, 13 Wall. 166; United States v. Lynah, 188 U. S. 445; United States v. Cress, supra; Wiggins v. United States, 3 C. Cls. 412; Grant v. United States, 1 C. Cls. 41, are to be distinguished from the case at bar on the facts, and are in harmony with the view herein expressed. In the cases of Pumpelly v. Green Bay Company, supra; United *733 States v. Lynah, supra; and United States v. Cress, supra, there was, in each case, a physical taking and appropriation of land for a public use. Liability upon the part of the Government appears to have been conceded in the case of United States v. Russell, 13 Wall. 623, the only question at issue being the amount of compensation payable. There was a physical taking and a complete destruction of property for a public use in the case of Grant v. United States, supra, and also in the case of Wiggins v. United States, supra. The facts in the case of Mills v. United States, supra, bear no analogy to the facts in the case at bar. The refusal to grant clearance to, and the detention of the Zeelandia, did not constitute a taking of the property of the plaintiff within the meaning of the Constitution of the United States.
In support of the contention of the plaintiff that the United States is liable under its own statutes, or municipal laws, it is urged that the detention of the Zeelandia was in violation of section 4197 of the United States Revised Statutes, making it mandatory upon the officer of the United States, to grant clearance to the Zeelandia upon compliance with the formalities specified in the statute; that these formalities were fully complied with by the Zeelandia; that the Zeelandia put into the port of New York, under the express or implied invitation of the United States; that she was a vessel of a friendly power, engaged in lawful commerce between neutral nations; that she had stores and provisions sufficient to carry her to her destination; that she put into the port of New York for the sole purpose of landing United States mails and passengers from South America; that when .she made application for clearance on October 22, 1917, she asked to clear with her original cargo, stores, and bunkers, not having taken on passengers, stores, or cargo in or from the United States; that no law of the United States authorized her detention, neither the provisions of the so-called “ espionage act ” or the so-called “ trading-with-the-enemy act ” being applicable to a vessel which neither sought to “ carry out ” anything from the United States, nor was suspected of carrying a false manifest; that the officers of the United States detained the Zeelandia, from October 22, 1917, to March 21, 1918, primarily for the purpose of having the *734 vessel available for further requisition, if needed by the United States; that under these circumstances the acts of the officials of the port in detaining the vessel were in violation of the laws of the United States. From this premise it is argued that the United States is liable to the plaintiff for the damage resulting from the unlawful acts of its officers.
The extent to which the United States may be liable to the plaintiff under the treaties between the Netherlands and the United States and under the usage and customs of the law of nations, and the extent to which this court may give consideration thereto, are matters which we will consider in due time, but for the purpose of determining the liability of the United States, under its own laws, to the plaintiff, for what are alleged to have been the illegal and unauthorized acts of its officers, it is necessary only to point out that the Government of the United States has never subjected itself to liability for the torts or wrongful acts of its officers. Robertson v. Sichel, 127 U. S. 507; Whiteside v. United States, 93 U. S. 247; Schillinger v. United States, 155 U. S. 163; United States v. Holland-America Line, 254 U. S. 148, reversing 53 C. Cls. 522; Wood v. United States, 61 C. Cls. 192.
The plaintiff, therefore, having no remedy under the Constitution or the laws of the United States (except in so far as modified by the international law) we have to consider the rights of the plaintiff under the principles of international law and the question as to what extent, if at all, this court is authorized to give consideration thereto in the instant case.
As we have heretofore pointed out, this case is before the court by virtue of a special jurisdictional act xaroviding that the claim of the plaintiff against the United States might be sued for in this court, and that the court should have jurisdiction to “ hear and determine such suit to judgment.” It appears that the claim of the plaintiff had been the subject of extended diplomatic correspondence between the Government of the United States and the Government of the Netherlands. Upon the authority of the President of the United States, the Secretary of - State advised the *735 minister of the Netherlands, under date of November 20, 1925, inter alia,
“ This Government [the Government of the United States] is quite agreed that in a case presenting a question as to the responsibility of the United States for damages toward an alien corporation as does that of the Zeelandia, the claimant, if invoking any principle of international law as applicable thereto, should have its day in court before a tribunal competent to pass on the contention and having crn/ple jurisdiction to do so. * * *. In recommending to Congress that the requisite jurisdiction be conferred upon the Court of Claims it would be far from the purpose of this Government to have the tribunal needlessly restricted or so to curtail its jurisdiction as to prevent an adjudication on the precise questions involved. On the contrary it would be the desire of this Government that the jurisdiction of the tribunal be sufficiently broad to enable it to pass on the question whether in the light of the evidence to be adduced, the United States owed any unfulfilled obligation to the foreign claimant.” (Italics ours.)
It was as a result of this correspondence, and other negotiations of a like tenor, that the special jurisdictional act above referred to was passed, and the issues here involved submitted to this court, rather than to arbitration, for decision. In the light of the obvious purpose of the two Governments to provide for the plaintiff a “ day in court ” for the determination of its claim, and of the express agreement that the plaintiff, if invoking “ any principle of international law as applicable thereto ” should have the principle passed upon by a tribunal “ having ample jurisdiction to do so,” we think the jurisdiction of this court to pass upon the issue in this case, as an international question, to be decided under the principles of international law, is clear.
This conclusion is in harmony with the holdings of this court and of the Supreme Court of the United States. The case of United States v. Dickelman, 92 U. S. 520, was a suit of a citizen of Prussia heard in this court on a special jurisdictional bill providing that the claim be referred to this court for “ its decision in accordance with law.” The Supreme Court said:
“ This [the special jurisdictional act] requires us to consider the rights of the claimant under the treaty between *736 the two Governments, as well as under the general law of nations. For all the purposes of its decision, the case is. to be treated as one in which the Government of Prussia is seeking to enforce the rights of one of its citizens against the United States in a suit at law which the two Governments have agreed might be instituted for that purpose.”
To substantially the same effect is the holding in The Ship Rose v. United States, 36 C. Cls. 290.
Certainly the Netherlands Government must have considered, in consenting to the reference of the matter to this court, that such principles of international law, if any, as-might be appropriate were to be given full consideration. Indeed, since the primary ground of the alleged liability of the United States grows out of what are claimed to be the illegal and unauthorized acts of its officers, it is difficult to conceive of any theory upon which the Netherlands would, have consented to a trial in this court, if the well-settled rule of law, consistently enforced in this court, that the United States is not liable for the tortious or unauthorized acts, of its officers, was to be invoked as a bar to the plaintiff’s claims-From the language of the jurisdictional act itself, as well as from the circumstances under which it was passed, and upon the plainest principles of justice and equity, we hold that the plaintiff is entitled to assert, and to have considered in its favor, to their fullest extent, such, if any, principles-of the law of nations as may be applicable to the facts in the case.
From this it follows that the court is not to be hampered in its consideration of this case by -other municipal jurisdictional statutes, of the United States, and that the ordinary limitations of the jurisdiction of this court, which find their basis in other statutes of the United States, such as the-Tucker Act, are not applicable in the consideration of this case. Furthermore, by the same reasoning, decisions based upon the municipal laws of the United States are inapplicable to the case at bar upon any point in which the statutes upon which such decisions are based are contrary to the principles of the law of nations. The position of the court is not different than it would be if we sat as an arbitration tribunal, chosen by agreement of the nations involved, to *737 decide the questions here presented upon the basis of the law of nations as applied to the facts in the case.
The rights of the plaintiff as a citizen of a friendly foreign power, when considered in the light of the principles of the law of nations, are very different than those of a plaintiff relying wholly upon the municipal laws of the United States. We have already pointed out that the United States does not admit, by its own statutes, any responsibility for the tortious or unauthorized acts of its officers. But in its relations with foreign nations, the United States bears what has been described as a “ wide, unlimited, unrestricted, and vicarious responsibility ” for the acts of its administrative officials and its military and naval forces. Oppenheim, International Law (second ed.) vol. 1, sec. 163. Governments are responsible, in their international intercourse, for the acts of their authorized agents, and if such acts were mistaken, or wrongful, liability arises against the Government itself for the consequences of the error or the wrong. Moses case (3 Moore 3127) ; Deschamps & Renaults Recueil (1901), 706; the Labaun, 4 Moore 3791; in the Coquitlam (15 Am. Jour, of Int. Law 301); Strauqhan v. United States, 1 C. Cls. 324.
Nor is it necessary, in order to sustain the liability of the United States, to show that the officers of the Government acted in bad faith; or with improper motives. While the bona fide nature of their conduct may be invoked by the officers in an explanation of their conduct to their own Government, its effect is merely to show that their conduct constituted an error in judgment. And any Government is responsible to other nations for error in judgment of its officials purporting to act within the scope of their duties. Schooner Jessie (XVI Am. Jour. Int. Law 115).
If, therefore, we accept the principle that the United States is responsible to the plaintiff for the consequences of any violation of the rights of the plaintiff, committed by the agents of the United States, we come to the controlling inquiry in this case, was the detention of the Zeelandia in violation of the rights of the plaintiff under the law of the nations ?
*738 The Zeelandia was registered under the flag of the Netherlands, a foreign friendly power. Although the United States was at war, no blockade of any nature had been declared upon the port of New York. When the Zeelcmdia voluntarily put into the port of New York on October 16, 1917, she did so upon the implied invitation of the United States. The owner of the vessel thereby submitted her to the proper and applicable laws of the United States having to do with the arrival and departure of vessels. Upon the other hand, the owner of the vessel had the right to rely upon an assumption that upon compliance with the applicable laws of the United States, she would be granted clearance and permitted to leave the port. Cunard S. S. Company v. Mellon, 262 U. S. 100.
Section 4197 of the United States Bevised Statutes (sec. 91, title 46, p. 1465 U. S. C.) provides as follows:
“ The master or person having the charge or command of any vessel bound to a foreign port shall deliver to the collector of the district from which such vessel is about to depart a manifest of all the cargo on board the same and the value thereof by him subscribed and shall swear to the truth thereof; whereupon the collector shall grant a clearance for such vessel and her cargo, but without specifying the particulars thereof in the clearance unless required by the master or other person having the charge or command of such vessel'so to do. * *
The provisions of this section are mandatory, making it the duty of the officers of the port to grant clearance to the vessel complying with the terms of the statute, unless justified in refusing to do so under other statutory authority.
We have found as a fact that on October 22, 1917, the plaintiff submitted the manifests of the Zeelandia and asked for clearance from the port of New York, which was refused. It is not contended that such manifests were false or not in due and regular form. We are of the opinion that the Zeelandia was thereupon entitled, as a matter of right, to her clearance papers, in accordance with the provisions of the laws of the United States and the unquestioned rules and usages of international law, unless, by some other valid statutory enactment, her detention was justifiable.
*739 It is argued by the United States that the detention of the Zeelandia was authorized under the provisions of the espionage act and the trading-with-the-enemy act, two of the wartime acts of the Congress of the United States.
Section 1 of Title VII of the espionage act of June 15, 1911 (40 Stat. 211, 225), provides that it shall be unlawful to “ export from ” or “ take out of ” the United States any of certain articles designated or to be designated by the President of the United States by presidential proclamation.
Section 3 of the same title of the act reads as follows:
“ Whenever there is reasonable cause to believe that any vessel, domestic or foreign, is about to carry out of the United States any article or articles in violation of the provisions of this title, the collector of customs for the district in which such vessel is located is hereby authorized and empowered, subject to review by the Secretary of Commerce, to refuse clearance to any such vessel, domestic or foreign, for which clearance is required by law, and by formal notice served upon the owners, master, or person or persons in command or in charge of any domestic vessel for which clearance is not required by law, to forbid the departure of such vessel from the port, and it shall thereupon be unlawful for such vessel to depart. Whoever, in violation of any of the provisions of this section shall take, or attempt to take, or authorize the taking of any such vessel, out of port or from the jurisdiction of the United States shall be fined not more than $10,000 or imprisoned not more than two years, or both; and, in addition, such vessel, her tackle, apparel, iur-niture, equipment, and her forbidden cargo shall be forfeited to the United States.”
It is contended by the United States that the Zeelandia was about to “ export from ” or “ take out ” of the United States certain interdicted property; therefore that the detention was justified. We think, however, that such contention would unduly extend the provisions of the act in question. When the Zeelandia came into the port of New York with a transit cargo, en route from South America to the Netherlands, she was fully provisioned and stored and had sufficient bunkers to carry her to her destination. When she made application for clearance on October 22, 1917, she asked leave to clear merely as she had come in, without the addition to her cargo or stores of any article whatever laden *740 in the United States. Her cargo was all consigned from South American ports to ports of the Netherlands. The words “ carry out,” “ export from,” or “ take out of ” must be held to apply only to an exportation or “ taking out ” of goods which were a part of the general mass of goods belonging to the United States and to the loading of bunker coals and provisions, which, while not technically “ exports,” nevertheless came out of the general mass of goods belonging to the United States. Whenever possible legislation should be so construed as not to violate or contravene treaty or international rights. Chew Heong v. United States, 112 U. S. 536; Johnson v. Browne, 205 U. S. 309. To hold that the espionage act applied to a situation, such as was the situation in regard to the Zeelandia, in which a vessel of a neutral, friendly power was about to depart from a port of the United States, having on board only cargo and stores loaded outside the United States and only temporarily within its confines, such cargo being consigned to ports outside of the United States, the vessel having neither cargo nor stores loaded within the United States nor out of the general mass of goods of the United States would, in our opinion, not only unduly extend the language of the act but would raise grave questions as to whether or not the act was in conflict with the rights of the neutral vessel under international law. We hold that such was not the intent of the Congress, and that no provision of the espionage act applied to the Zee-landia or justified the detention of the vessel.
It is suggested also by the United States that the detention of the Zeelandia was justified under section 14 of the trading-with-the-enemy act (40 Stat. 424), which reads as follows:
“ That, during the present war, whenever there is reasonable cause to believe that the manifest or the additional statements under oath required by the preceding section are false or that any vessel, domestic or foreign, is about to carry out of the United States any property to or for the account or benefit of an enemy, or ally of enemy, or any property or person whose export, taking out, or transport will be in violation of law, the collector of customs for the district in which any such vessel is located is hereby authorized and empowered, subject to review by the Presi *741 dent, to refuse clearance to any such vessel, domestic or foreign, for which clearance is required by law, and by formal notice served upon the owners, master, or person or persons in command or charge of any domestic vessel for which •clearance is not required by law, to forbid the departure of -such vessel from the port, and it shall thereupon be unlawful for such vessel to depart.”
This contention can not be sustained for the reason that the condition precedent to the refusal of clearance, as set forth in this act, did not exist in the case of the Zeelandia. 'There is no showing in this record that the United States '“had reasonable cause to believe,” or for that matter, that there was any suspicion, that the manifests of the Zeelandia were false, or that she was carrying any property for the -account of an enemy, or of an ally of the enemy. As we have heretofore pointed out, the cargo on board the Zeelandia was all consigned to the Netherlands Oversea Trust Company. This company had been especially organized for the purpose of guaranteeing to the allied Governments that shipments consigned to it were not for the account of the enemy or intended to aid the enemy or any ally thereof. 'The Netherlands Oversea Trust Company enjoyed the confidence of the British Government, and the fact that it had been organized was due, at least in part, to the suggestion of that Government.
Furthermore, it is clear that the Zeelandia was not in fact detained because she was about to export from or carry out of the United States any article whatsoever, or because she was suspected of carrying cargo intended for the use of the enemy. The conclusion is manifest, and we have found,the Zeelandia was detained for the primary purpose of having the vessel available for use by the United States or to be placed at the disposal of the Allies of the United States. The primary interest of the United States was in the vessel itself, not in her cargo or stores. Any other purpose was secondary to this paramount consideration.
In the view which we take of this situation — i. e., that neither the terms of the espionage act, nor the terms of the trading-with-the-enemy act, applied to the Zeelandia — it is unnecessary to consider the further contention of the plain *742 tiff that in so far as this war-time legislation of the United States was in conflict with the rules of international law it was not binding upon the owners of the Zeelandia.
The right of the United States to control the exportation or the “ taking out,” or the “ carrying out ” of the United States, goods, stores, or materials of its own, and the exportation or “ carrying out ” of which it regarded as inimical to its interest, is undoubted. By holding, and the language of the acts in question requires us to hold, that the Congress of the United States did not intend to go further than this we avoid any conflict, real or apparent, with the rules of international law. Such construction, under the authorities, is to be sought whenever possible and in this case is in harmony with the language and purposes of the acts in question. Chew Heong v. United States, supra.
It is also urged by the United States, and we have found, as appears from our findings of fact herein, that after the Zeelandia put into the port of New York the plaintiff applied for an export license to take on additional stores; that such export license was rightfully refused by the United States; that, therefore, the Zeelandia, for the lack of such export license, was lawfully detained within the United States.
The application for an export license to take on additional stores was made on October 17, 1917, and the application was made to enable the Zeelandia to take on a number of Dutch citizens who were stranded in the United States and desired to book passage to Holland. The additional stores which the Zeelandia desired to take on were necessary if these additional passengers were to be afforded passage, otherwise the Zeelandia needed nothing to enable her to complete her voyage. On October 19th, after the receipt of this application, the director of the export license bureau of the United States Shipping Board wired the New York representative of the plaintiff to furnish for inspection copies of the manifests of the Zeelandia and lists of stores and fuel aboard. The manifests and lists were furnished, but the export license requested was not issued. It is not disputed that the United States was within its rights in withholding *743 the license, and no claim is made that the plaintiff suffered any damage for which it could recover from the United States thereby.
Subsequently, however, on October 22, 1917, the plaintiff abandoned its plan to furnish transportation to the Dutch citizens who sought passage to Holland, and submitted to the customs officials in New York the manifests of the Zeelandia and applied for clearance for the vessel without the additional stores and laden merely with the transit cargo, stores, and bunkers with which she had come into the port. The plaintiff did not submit and did not have an export license for her cargo, bunkers, or stores.
Upon the ostensible ground that no such license was submitted clearance was refused, and on the same day (October 22d) the plaintiff made application for an export license for the cargo, bunkers, and stores on board the Zeelandia, protesting, however, that the United States could not legally require the license, since the vessel had on board neither cargo, bunkers nor stores loaded in any port of the United States or of any territory subject to the jurisdiction of the United States, or brought into the United States with the intention to be made a part of the goods or commerce of the United States, and that all of the cargo, bunkers, and stores of the Zeelandia were transit cargo, en route from South American ports to ports of the Netherlands.
We are of the opinion that neither the application for a license to take on additional stores, made on October 17,1917, nor the application for a license covering the cargo, bunkers, and stores already carried by the Zeelandia, on October 22, 1917, justified the detention of the vessel, when, on the latter date, she sought clearance. As to the first application, it is shown that the plaintiff, as it had the undoubted right to do, abandoned its intention to take on additional passengers or stores. When application for clearance was made on October 22,1917, the ZeelandicA sought to take out merely the cargo, bunkers, and stores with which she came into the port. Her owners had no need for, no occasion to furnish, an export license for any additional stores, for the Zeelandia was not laden with any such additional stores. When the *744 second application for an export license was made, the owners of the Zeelandia accompanied the application with a protest that the license could not lawfully be required, the reason being clearly stated. There was nothing in either transaction waiving the right of the vessel to clearance with her-original cargo, bunkers, and stores, or admitting the necessity for an export license, and we do not think the situation as it existed on the 22d was affected one way or the other by either of these transactions. The question in this casé-is the right of the Zeelandia to clearance, with her original cargo, stores, and bunkers, and it is not necessary to consider-what her rights might have been or how far the detention might have been justified, had the vessel been required to take on additional cargo or stores within the United States. . No export license was required under any law of the United States, to permit the Zeelandia to sail with her original transit cargo, stores, and bunkers.
However far the detention of the Zeelandia may have been justified, from the standpoint of the United States, by the existing emergency and the urgent need for additional ships-for use by the United States; however beneficial to the United States and its associated governments in the conduct of the war may have been the acts of the officers of the port,. it is clear that the rights of the plaintiff were disregarded and its property detained, to its damage, by the acts of the-United States. Neither the need of the United States for additional shipping nor the good faith of its officers can be pleaded in defense of the claim of the plaintiff that it be-made whole for the damage thereby sustained by it. Granting that the emergency did exist, and granting that the acts of the officers of the United States, whether done in an excess of zeal for the welfare of this country or in ignorance of the clear rights of the Zeelandia to be allowed clearance, were-beneficial to the United States, the duty yet rests upon that Government to make restitution for the loss occasioned to the plaintiff by the acts in question.
We conclude, therefore, that the Zeelandia was entitled' to clearance under the laws of the United States as well asunder the law of nations; that her detention was not justified» *745 by the provisions of the espionage act or the trading-with-the-enemy act; that damage was caused to the plaintiff by the detention, for which the United States, under clear principles of international law, must assume responsibility; that the special jurisdictional act by virtue of which this case is heard, authorizes, indeed, compels, this court to give effect to the usages, customs, and sanctions of such provisions of the law of nations; further, that in equity and good conscience the United States should be held accountable to the plaintiff for the damage which undoubtedly accrued to the owners of the Zeelandia by virtue of her detention.
There is yet to be considered the question of the amount of the damage suffered by the plaintiff, as well as the question of the allowance of interest to the plaintiff since the accrual of the liability. It is shown the market value of the use of the Zeelandia on a bare-boat charter basis — that is to say, market value of the use of the vessel alone, without crew, management, or supplies, was $8.3125 per gross register ton per month, making the said market value of the ship 7.9995 gross register tons $66,458.44 per month, or a total for the period from October 22, 1917, to March 20, 1918, of $332,-292.20; that it was necessary for the plaintiff to keep the vessel in operating condition from October 22, 1917, to March 20, 1918, maintaining the Crew on board, keeping steam in the boilers; that the cost of coal lost and consumed was $30,-602.02; that the wages of the crew amounted to $49,086.00, the cost of provisions for the officers and crew to $19,125.00, repairs to $7,500.00, other port expenses to $4,192.50, water to $850.50, and insurance to $3,177.00. For these items, amounting to $446,826.22, we consider that the plaintiff is entitled to reimbursement.
It is further shown by the findings of fact in this case that the portion of the daily average expenditures of the plaintiff for general office expense, and other overhead expenditures incidental to the maintenance of the general offices in Holland, and its docks and offices in foreign ports, which the plaintiff had customarily allocated against the Zeelandia as a part of its fleet, prior to the period of the detention, was $50.00 per day or a total for the period from *746 October 22, 1917, to March 20, 1918, of $7,500.00; that the portion of the average daily cost of general advertising of the plaintiff allocated to the Zeelandia from October 22, 1917, to March 20, 1918, was $18.27 per day, or a total of $2,740.50.
These two items, which total $10,240.50, can not be allowed as a part of the plaintiff’s damages. While the necessity for the maintenance by the plaintiff of its overhead organization and its general offices, in Holland and elsewhere is recognized, we are inclined to the view that the cost of such organization must be said to be, at least in the main, chargeable to the transaction of the business of the company as a steamship carrier, rather than as a mere owner of the Zeelandia. While the propriety of the allocation by the plaintiff for its own accounting purposes of an arbitrary part of its general overhead expenses, against the Zeelandia, as well as against the other vessels in its fleet, is not questioned, we can not say that such allocation constitutes proof that the plaintiff in fact incurred any loss, on this account, attributable to the detention of the Zeelandia or that the amount of the loss is fixed by the charge allocated to the vessel in the plaintiff’s books. The overhead expense of the company was not increased or affected in any way by the detention of the vessel, and we regard this element of the plaintiff’s claim as too remote to be chargeable to the United States. For similar reasons the general charge of an arbitrary portion of the advertising expense of the plaintiff to the Zeelandia does not constitute proof that the amount so charged was in fact lost to the plaintiff by any act of the United States. No part of the overhead expense of the company, or of its advertising expense, can be said to represent cash, or out-of-pocket, loss to the plaintiff. These expenses can not be said to have been directly and proximately attributable to the acts of the United States or to the enforced idleness of the Zeelandia. The burden of proof upon the question of the amount of damages, as well as upon all other questions in the case, is upon the plaintiff. Such proof must be clear and specific, so that the court may not be compelled to resort to doubt, speculation, or conjecture in fixing the *747 damages. The showing upon the two items for overhead expense and for general advertising is not sufficient to justify a judgment against the United States, and as to these items, the plaintiff can not recover.
The plaintiff claims interest on the amount of its damages, from the 20th day of March, 1918, to date at the rate of 5.088 per centum per annum. It is shown that at all times subsequent to March 20, 1918, the plaintiff has been required in order to maintain its business, to borrow sums of money in excess of the sums claimed in this suit, and during all times subsequent to March 20, 1918, the plaintiff has borrowed and maintained borrowings far in excess of the amounts claimed in this suit, and has paid for the use of the money thus borrowed interest at the average rate of 5.088 per cent per annum. Upon the part of the United States it is contended that the Government is not liable to pay interest on claims in the absence of express statutory authority to that effect, section 177 of the Judicial Code being particularly relied upon. It is contended that the reference, by special act of the Congress, of claims to this court for adjudication, does not take such claims out of the application of the section mentioned. Omaha Tribe of Indians v. United States, 53 C. Cls. 549; Cherokee Nation v. United States, 270 U. S. 476; Tillson v. United States, 100 U. S. 43, and other cases are cited in support of this contention. The general rule referred to is not open to dispute, and the cases cited are but a few of the cases .in which this and other courts have uniformly refused to allow interest upon various claims asserted against the United States. But we think that neither the Judicial Code nor the cases cited are applicable to the case at bar, in which this court sits not in its statutory capacity to determine a claim against the United States in accordance with the statutes and municipal obligations thereof (of which the Judicial Code is one) but rather “ in the character of an international tribunal ” to determine the rights of the plaintiff against the United States, as they exist under the law of nations. The United States can no more plead section 177 of its own Judicial Code as a bar to the allowance of interest upon the claims of the plaintiff, than it can plead *748 the unquestioned municipal law of the United States that the Government is not responsible for the unauthorized acts of its officers to the claim itself. We have discussed the application of the rules of international law to the question' of the liability of the United States for the acts of its officers and agents in this case, and the reasoning is fully applicable to the question of the allowance of interest. Certainly if this question had been submitted to the decision of arbitrators, as an international question, between the Government of the United States and the Government of the Netherlands, in accordance with diplomatic custom, the United States would not be permitted to assert one of its own statutes as a bar to its liability for the claim itself or for interest thereon. The situation is not altered by the fact that by the special jurisdictional act the controversy has been referred to this court for decision, rather than to a commission for arbitration. Therefore, the question of the right of the plaintiff to interest is to be determined according to the principles of international law, wholly without reference to the municipal laws of the United States.
In the absence of a treaty between the United States and the Netherlands covering the point, we must have resort to the decisions of other tribunals to which have been submitted like controversies, for a determination of the rights of the plaintiff in this regard. The general rule appears to be that interest is allowable in all cases where the loss is either liquidated, or is capable of ascertainment by computation merely. Claims for “ property losses,” being claims for property taken, damaged, or destroyed, belong to this class. Claims for losses based on personal injuries, death, maltreatment to prisoners of war, or acts injurious to health, capacity to work, or honor, are of a class where the loss is neither liquidated nor can the amount thereof be determined by any method of computation. The claim of the plaintiff, being ascertainable by computation, is of the former class, and interest is properly allowable thereon. This holding is in accordance with the rules adopted by the Mixed Claims Commission, United States and Germany, one of the most recent commissions of this character to function, and one *749 to which were referred a large number of important controversies. See Administrative Decision III, United States ■and Germany Mixed Claims Commission.
A more difficult question is presented as to the rate of interest to be allowed and the determination of the period for which interest should be allowed. Varying rates of interest have been allowed by different tribunals at different times and under varying circumstances. Ordinarily interest has been allowed from the date of the injury, although, there are cases in which the date has been fixed at the date" of the demand for compensation. There does not appear to be any uniform rule, of universal application, governing" either the rate of interest or the period for which it is-allowable.
While it has been shown that the average rate of interest-paid by the plaintiff, upon money borrowed by it, has been? a certain per cent, we do not consider either that the fact-that the plaintiff has been compelled to borrow money and' pay interest thereon is a necessary condition precedent to> the recovery by it of interest upon its claim, or that the’ rate of interest paid by the plaintiff upon its loans is determinative of the rate of interest which it should be allowed to recover. The plaintiff is entitled to interest, it has been said, because such allowance is “ rightful ” and is necessary' adequately to compensate it for the damage. The rate off interest actually paid out by the plaintiff might reflect' many elements not pertinent to an inquiry as to the interest it should be allowed on its claim, and would lead us far afield from the subject under discussion. In the absence off a universal rule upon the subject, we hold that the rate' adopted by the Mixed Claims Commission, and by that commission made applicable to a great number of claims, varying widely in their nature, that is five per centum per annum,-rather than the slightly higher rate (5.088 per centum per" annum), should be allowed, and, also in accordance with the-rule adopted by that commission, that the interest should-begin to run from the date of the injury, which in this case" we hold to be the date upon which the injury became complete and the' damages became possible of computation. • *750 March 20, 1918. Interest should run from that date to the date of the entry of judgment herein.
Judgment will therefore be entered in favor of the plaintiff for the sum of $446,826.22, with interest thereon to be computed from March 20, 1918, to the date hereof, at the rate of five per centum per annum. It is so ordered.
Whalet, Judge; LittletoN, Judge; GREEN, Judge; and Booth, Ohief Justice, concur.